IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| NATIONAL STRATEGIES LLC, | ) | CASE NO. 5:10-cv-00974 |
| | ) | |
| Plaintiff, | ) | JUDGE DAVID D. DOWD, JR. |
| | ) | |
| v. | ) | **REPLY MEMORANDUM IN SUPPORT** |
| | ) | **OF DEFENDANT'S MOTION FOR** |
| NAPHCARE, INC., | ) | **SUMMARY JUDGMENT** |
| | ) | |
| Defendant. | ) | |

## I.    <u>INTRODUCTION</u>

National Strategies' Opposition to Defendant's Motion for Summary Judgment ("Opposition") merely confirms that its claims fail as a matter of law.  National Strategies sprinkles its Opposition with factual allegations revealing a dispute concerning the terms of the alleged "success fee" agreements, and engaging in rote speculation concerning the effect of services purportedly provided by its "consultants" in 2004 on agreements executed by NaphCare years later.  But that dispute is not material to the question of law before this Court: whether the alleged "success fee" agreements for lobbying services — supplied by "consultants" hired by National Strategies on a project-basis — are void as against public policy in New York, Ohio and Nevada.  National Strategies' Opposition provides no answer to this question.  Instead, it wrongly conflates a common law breach of contract defense with an exercise in statutory construction, carefully evading any consideration of the public policies underlying the statutes that it parses — policies, such as the need to eradicate the inherent temptation created by a contingent fee to use improper means to influence official action, that apply equally to each of the alleged "success fee" agreements under which National Strategies seeks to recover.

A proper analysis of NaphCare's affirmative defense under the applicable laws of each state demonstrates that the "success fees" National Strategies seeks are against public policy, and the agreements under which National Strategies seeks to recover are therefore void. Accordingly, NaphCare is entitled to summary judgment.

II.    **LAW AND ARGUMENT**

    A.    **NaphCare is Entitled to Summary Judgment on National Strategies' Breach of Contract and Declaratory Judgment Claims.**

NaphCare established in its Memorandum in Support that the common law has long recognized that agreements to solicit a public contract for a contingent fee are void as against public policy, and that this public policy bar rests on the considered judgment that contingent fee agreements create an inherent temptation to use improper means to influence official action. (ECF No. 36-1, Mem. in Supp. at 11.)  National Strategies' Opposition misapprehends both the nature of this public policy defense and this Court's task in analyzing that defense under diversity jurisdiction. *See Erie R.R. v. Tompkins*, 304 U.S. 64 (1938).

As to the former, National Strategies erroneously assumes at pages 10-16 that NaphCare's public policy defense is solely a matter of state statutory law, resolved by principles of statutory construction.  Not so.  While a violation of a state statute is *sufficient* to nullify a contract, it is not necessary.  Rather, blackletter principles of contract law establish that public policy is found in and may be "declared by Constitution; sometimes by statute; [and] sometimes by judicial decision." *Pittsburgh C.C. & St. Louis Ry. Co. v. Kinney*, 95 Ohio St. 64, 68 (1916). Accordingly, when evaluating the merits of a public policy defense, a court must examine the "sound and substantial public policies underlying" each of these sources. *J.F. v. D.B.*, 116 Ohio St.3d 363, 2007-Ohio-6750, at ¶5.  Therefore, National Strategies' attempts to parse the various statutory enactments cited in NaphCare's summary judgment motion merely beg the question of

whether the public policies underlying those statutes, and the policies reflected in judicial decisions on the same subject, are violated by the allegations of National Strategies' Complaint.

As to the latter, it is well-established that this Court's task is to "apply state law 'in accordance with the then controlling decision of the [state's] highest court,'" and, where the state's highest court has not yet spoken, predict what that court would do from "available data" — including "relevant dicta from the state supreme court, decisional law of appellate courts, restatements of law, law review commentaries, and the 'majority rule' among other states." *Angelotta v. Am. Broad. Corp.*, 820 F.2d 806, 807 (6th Cir. 1987) (internal citations omitted). Accordingly, National Strategies' attempts to limit New York Court of Appeals' precedent through citations to New York trial and intermediate appellate opinions (Opp. at 11-12), and its cursory dismissal of Ohio Supreme Court precedent (*id.* at 13), are misguided.

Here, long-standing federal precedent has articulated "sound and substantial policies" that underlie bans on agreements to hire contractors to solicit specific public contracts for contingent fees, which include the necessity to protect "government agencies against corrupting influences." *Quinn v. Gulf & Western Corp.*, 644 F.2d 89, 93 (2d Cir. 1981). The law recognizes the "tendency" of contingent fees to "induce improper solicitations," and will not look at "what was done in the particular case." *Hazelton v. Sheckles*, 202 U.S. 71, 79 (1906); *accord Rome v. Upton*, 648 N.E.2d 1085, 1088 (Ill. Ct. App. 1995) ("[C]ontingent fee contracts for procuring favorable legislation are void since such a contract tends *necessarily* to influence legislation improperly, for the promise of payment of a contingent fee is a direct and strong incentive to the exertion of nor merely personal but sinister influence of the legislative body.") (emphasis in original) (internal quotation omitted). These concerns apply equally to both legislative and executive-branch lobbying; "there is no real difference in principle between

3

agreements to procure favors from legislative bodies, and agreements to procure favors in the shape of contracts from the heads of departments." *Id*.

The bans on contingent fee agreements enacted in each of the states at issue in this case are wholly consistent with this longstanding federal public policy.  National Strategies does not (and cannot) point to any authorities suggesting that the bans on contingent fee agreements in these states are based on any other policy.  Nor does National Strategies dispute the nature of its "success fee," which is plainly contingent in nature.  (*See* ECF No. 40, Gordon 11/08/10 Dep. at 78 ("A success fee is all for winning the contract.").)  Accordingly, a proper analysis of each state's law confirms that National Strategies' breach of contract claim is barred because the "success fees" that National Strategies seeks are void and unenforceable as against the public policy of each state in which the lobbying services were purportedly rendered.

### 1.     Success fees are against public policy in the State of New York.

National Strategies acknowledges that the alleged "success fee" agreement on which its claim is based is currently prohibited by New York law.  (*See* Opp. Br. at 10; ECF No. 43, Gordon 5/5/11 Dep. at 23.)  National Strategies argues that this prohibition does not apply to its claim because: 1) the legislature did not "expressly provide" that N.Y. Legislative Law Section 1-k would apply retroactively; and 2) Section 1-k does not "specifically provide" for the invalidation of a contingent fee contract.  (Opp. Br. at 11-13.)  Both arguments are meritless. The New York legislature has determined that contingent fee contracts for lobbying services are inherently unlawful, and this determination is fully applicable to National Strategies' "success fee" claim.

    **(a)**     **NaphCare's public policy defense does depend on whether the statutory ban on success fees is "expressly retroactive."**

*First*, "express retroactivity" is not a requirement for asserting that a contract is invalid as against public policy based on a change in state criminal law. Rather, New York's highest court recognizes that "[t]he general principle that the validity of a contract depends upon the law that existed at the time the contract was made *does not appertain to variations of the law that are made due to changes in public policy*." *Bloomfield v. Bloomfield*, 764 N.E.2d 950, 953 (N.Y. 2001) (emphasis added). National Strategies suggests that *Bloomfield* "comports" with an earlier, intermediate appellate decision — which it claims stands for the principle that retroactive application may be used "as a shield against a claim of illegality," but not "as a sword in seeking to invalidate agreements." (Opp. Br. at 12 (quoting *Goldfarb v. Goldfarb*, 450 N.Y.S.2d 212 (N.Y. App. Div. 1982).) But the reasoning of an inferior court cannot limit *Bloomfield*, see *Angelotta*, 820 F.2d at 807, and, in any event, a careful analysis of the *Goldfarb* opinion confirms that its use of the sword-versus-shield metaphor was confined to the unique history of the statute at issue in that case.

*Goldfarb* involved a challenge to a separation agreement in a domestic relations case in the context of a state statute (section 5-311 of the New York General Obligations Law) that had been amended to respond to case law holding the former version unconstitutional based on gender discrimination. 450 N.Y.S.2d at 213. While the separation agreement contained a limitation on spousal support payable by the husband that would have been invalid under statutory law at the time of its execution, it was valid under the gender-neutral standards adopted by the version of the statute in effect at the time the lawsuit was filed. *Goldfarb* acknowledged the general rule that "a contract '*may be affected by subsequent legislation in the exercise of the*

*police power, or by a subsequent statute announcing a new public policy * * * or by repeal of a prohibitory act*," and relied on this principle to hold that the defendant was "insulated from plaintiff's claim that said provisions are illegal." *Id*. at 214-15 (emphasis added).

The language in *Goldfarb* that National Strategies lifted out-of-context at page 12 of its Opposition followed this holding, introduced by the appellate court's recognition of a "need for further clarification on the issue of the retroactive application *of the present statute*." *Id*. at 215 (emphasis added).  *Goldfarb* noted that precedent holding former section 5-311 unconstitutional had been expressly limited "only to actions pending, including those in the appellate process, at the time we handed down that decision." *Id*.  To harmonize its ruling with this precedent, *Goldfarb* held that the current statute could not be used "as a sword" to the extent that it would otherwise "support such a constitutional challenge on the ground that it represents the law and policy that should have governed the rights of the parties to a separation agreement concluded prior to the repeal of former section 5-311." *Id*.

No similar history exists in this case; as a result, there is no basis on which to limit the "retroactive" effect of Section 1-k in the context of NaphCare's public policy defense.  Therefore, National Strategies' "success fee" claim must by analyzed within the context of this legislative ban on contingent fee contracts, which was in effect at the time this lawsuit was filed.

> **(b)** **The New York legislature has determined that "success fee" contracts are inherently unlawful.**

*Second*, there is no dispute that the act of entering into a "success fee" contract is proscribed by New York law:  New York law forbids the "ret[ention] or employ[ment]" of any lobbyist on a contingent fee basis (N.Y. Legislative Law § 1-k(a)), and it prohibits any "person" from "accept[ing] such a retainer or employment" (N.Y. Legislative Law § 1-k(b)).  National Strategies argues that even though under New York law *no one* can contract for lobbying

6

services on a contingent fee basis, and *no one* can accept a contingent fee for lobbying services, it is entitled to seek a "success fee" in this case because Section 1-K does not "specifically provide for the invalidation of contingent fee contracts."  (Opp. Br. at 12.)  But it follows *a fortiori* from the fact that such contingent fee contracts have been declared inherently unlawful that they are invalid.  *See, e.g.,* 96 Laura Hunter Dietz et al., *Contingent Fees*, N.Y. Jur. 2d § 166 (stating that contingent fee contracts for lobbying services "are void by policy of law and cannot be enforced in the courts").

National Strategies misguided quest for a more "specific" statement invalidating contingent fee contracts flows from a misreading of case law addressing the collateral consequences of violations of licensing or other regulatory laws.  These decisions recognize that "[i]llegal contracts are, as a general rule, unenforceable," but hold that a violation of a licensing or other regulatory provision will not "necessarily render a contract illegal and unenforceable" where "the statute does not provide expressly that its violation will deprive parties of their right to sue on the contract, and the denial of relief is wholly out of proportion to the requirements of public policy[.]"  *Benjamin v. Koeppel*, 650 N.E.2d 829, 830 (N.Y. 1995); *see also John E. Rosasco Creameries, Inc. v. Cohen*, 11 N.E.2d 908 (N.Y. 1937) (alleged violation of milk dealer licensing law did not render contract void as a matter of public policy where "[t]he statute involved does not expressly provide that contracts made by unlicensed milk dealers shall be unenforceable").  Such an additional, express statement is necessary because the act of contracting in those cases is not inherently unlawful; rather, the regulatory requirements at issue specify the manner in which such contracts may be executed, and New York courts have held that it is primarily for the legislature to determine whether a violation of those regulations prevents a suit on the allegedly invalid contract.  *Benjamin*, 650 N.E.2d at 830-31.

But no additional statement about the consequences of entering into an unlawful agreement is necessary where, as here, the New York legislature has determined that the very act of entering into the contract at issue is inherently unlawful.  *See, e.g., Stone v. Freeman*, 82 N.E.2d 571, 572 (N.Y. 1948) (commission agreement for clothing sale violating a criminal statute that "makes it a misdemeanor to give or offer such a commission or bonus to a purchasing agent" is "illegal, criminal and unenforceable").  Indeed, it would be nonsensical to require a state legislature to *assume* that persons would engage in inherently unlawful conduct solely for the purpose of adding an additional statement that contracts entered into in violation of that law are "contrary to public policy and wholly void."  (Opp. Br. at 12.)

Since National Strategies admits the "success fees" it seeks are contingent in nature and unlawful under New York law as it exists today (*see* Opp. Br. at 10; ECF No. 43, Gordon 5/5/11 Dep. at 23), the alleged New York "success fee" agreement is void as against public policy. NaphCare is therefore entitled to summary judgment on National Strategies' breach of contract and declaratory judgment claims to the extent that those claims relate to New York.

**2. <u>Success fees are against public policy in the State of Ohio.</u>**

NaphCare is also entitled to summary judgment on National Strategies' breach of contract and declaratory judgment claims to the extent that those claims relate to Ohio.  National Strategies' Ohio-based statutory construction arguments misapprehend the nature of NaphCare's public policy defense.  *See* Opp. Br. at 13-15; *see also* pp. 2-3, supra.  As explained above, National Strategies' focus on statutory construction merely begs the question of whether the allegations of National Strategies' Complaint violate the public policies underlying those statutes, which are also clearly reflected in the Ohio Supreme Court decision cited in NaphCare's summary judgment motion.  The answer to that question is plainly "yes."

First, the proper question is whether success fee agreements violate the public policy of *the State of Ohio.*  Contrary to National Strategies' apparent assumption at pages 14-15, the relevant public policy must be determined and defined uniformly at the *state level* — not on a county-by-county basis.  *See Kinney*, 95 Ohio St. 64, at syllabus (explaining that "'[p]ublic policy' is the community common sense and common conscience extended and applied *throughout the state*") (emphasis added); *J.F.*, 116 Ohio St.3d 363, 2007-Ohio-6750, at ¶6 (framing the issue as whether "*Ohio* has a public policy concerning gestational surrogacy") (emphasis added).

Second, the public policies underlying the uniform state-level prohibitions on success fee contracts plainly apply to agreements executed at the county level as well.  As explained at pages 3-4 above, these policies rest on the nature of a contingent fee and the inherent temptation raised by such a fee to use improper means to influence official action, not on the level of government that will be influenced.  As the Supreme Court of Ohio has observed, the employment of an agent to solicit public contracts for a fee contingent upon success by "its very nature suggest[s] the use of sinister and corrupt means." *Winpenny v. French*, 18 Ohio St. 469, 476 (1869) (internal quotation omitted).  This concern applies equally to agreements executed at the county or municipal level, including those which, as here, involve the provision of constitutionally-mandated medical services to state prisoners.

Since there is no valid basis limiting the public policies underlying the state statutes to agreements executed at the state level, and National Strategies has suggested none, NaphCare is entitled to summary judgment on National Strategies' "success fee" claim with respect to the State of Ohio.  *Accord Rome v. Upton*, 648 N.E.2d 1085, 1088 (Ill. Ct. App. 1995) (holding that

public policy against contingent fee lobbying contracts articulated at the state level "extends to city councils as well as the General Assembly").

### 3.    Success fees are against public policy in the State of Nevada.

Finally, NaphCare is entitled to summary judgment on National Strategies' "success fee" claim with respect to Nevada.  National Strategies' arguments at pages 15-16 of its Opposition concerning Nevada law suffer from the same flaws as its arguments concerning Ohio law. National Strategies' rote reliance on principles of statutory construction does not address the policies underlying the ban on contingent fee agreements specified in Section 218H.930(4) of the Nevada Revised Statutes, much less explain why those policies do not apply with equal force to a contract executed with Clark County, Nevada.

In short, there is no reason to assume that Nevada law rests on public policies that differ from those supporting the Ohio ban on contingent fee lobbying agreements — *viz.*, that the employment of an agent to lobby public officials for a contingent fee by "its very nature suggest[s] the use of sinister and corrupt means." *Winpenny*, 18 Ohio St. at 476.  Because the policies that underlie the passage of legislation prohibiting contingent fee lobbying agreements, and presumably undergird Section 218H.930(4) of the Nevada Revised Statutes, apply equally to contingent fee agreements executed for lobbying services performed at the county level, National Strategies' "success fee" claim is no less violative of public policy simply because it seeks fees relating to an agreement executed with Clark County, Nevada.

Accordingly, NaphCare is entitled to summary judgment to the extent that National Strategies' claims seek payment of further "success fees" for services provided in the State of Nevada.  *Accord Sholer v. Oklahoma ex rel. Dep't of Public Safety*, 149 P.3d 1040, 1046 n.6 (Okla. Ct. App. 2006) (contract to procure official action by executive to settle significant

litigation with state agency void as a matter of public policy, even though such settlements were not covered by legislative prohibition on contingent fee lobbying).

**B.    National Strategies Cannot Establish an Unjust Enrichment Claim.**

NaphCare is also entitled to summary judgment on National Strategies' unjust enrichment/quantum meruit theory.  National Strategies offers no independent arguments supporting its unjust enrichment/quantum meruit theory.  National Strategies simply asserts that its arguments relating to the validity of the alleged "success fee" agreements under New York, Nevada and Ohio law apply equally to its unjust enrichment claim.  (Opp. Br. at 16.)  Since National Strategies' arguments supporting its breach of contract claim are fatally flawed (see pp. 2-11, supra), its unjust enrichment theory likewise fails as a matter of law for the reasons explained in NaphCare's summary judgment motion.  (ECF No. 36-1, Mem. in Supp. at 14-15.)

**C.    National Strategies Cannot Establish A Claim for Fraud.**

National Strategies' arguments concerning its legally insufficient fraud claim are equally meritless.  NaphCare established in its Memorandum in Support that National Strategies' fraud claim is based on three alleged "statements or omissions": 1) alleged "statements" by McLane that NaphCare would pay National Strategies for services to be provided in the future; 2) representations "by way of payment" that NaphCare's payments of success fees under the Nevada Contract Oversight Fee Schedule were "the full one percent"; and 3) allegedly "concealing" from National Strategies "that NaphCare had entered into government contracts . . . that would trigger payment requirements of the NaphCare" Contract Oversight Fee Schedules. (ECF No. 36-1, Mem. in Supp. at 15-16; *see also* Pl.'s Compl., at ¶ 50.)  National Strategies does not disagree.  (Opp. Br. at 17.)  And none of these alleged statements or omissions can support a claim for fraud.

As NaphCare explained in its Memorandum in Support, National Strategies cannot establish a fraud claim with respect to the first category of alleged "statements" because there is no evidence these "statements" were made with no present intention to perform.  (ECF No. 36-1, Mem. in Supp. at 16.)  National Strategies simply asserts in conclusory fashion that the "[t]he question of whether NaphCare made such promises and made them with the intention of not keeping them is a genuine issue of material fact that should be decided by a jury[.]"  (Opp. Br. at 18.)  Such a conclusory statement unaccompanied by any citation to the record, however, is woefully insufficient to discharge National Strategies' Rule 56 burden.  *See* Fed. R. Civ. P. 56(c)(1)(A) (stating that "[a] party asserting that a fact . . . is genuinely disputed *must* support the assertion by *citing to particular parts of materials in the record*") (emphasis added).  Moreover, National Strategies does not (and cannot) square its conclusory assertion with the undisputed fact that McLane made "success fee" payments for several years for the Clark County, Nevada contract.  (Pl.'s Compl, at ¶ 22.)  Because there is no evidence that McLane made "statements" that NaphCare would pay for future services without a present intention to perform, NaphCare is entitled to summary judgment with respect to this fraud allegation.  *See Telxon Corp. v. Smart Media of Delaware, Inc.*, 9th Dist. Nos. 22098, 22099, 2005-Ohio-4931, at ¶ 33 n.10.

NaphCare is also entitled to summary judgment on National Strategies' other fraud theories.  NaphCare established in its summary judgment motion that National Strategies' fraud theories based on alleged misrepresentations "by way of payment" and alleged "concealment" of public contracts executed by NaphCare failed to state a claim for fraud because both related to "duties" purportedly imposed by the "Consulting Agreements." (Pl.'s Compl., at ¶ 50.)  They therefore fell within the well-established legal principle that a claim for fraud cannot be predicated on the mere breach of a contractual duty.  (ECF No. 36-1, Mem. in Supp. at 16-17.)

12

National Strategies does not dispute this legal principle; rather, it argues that its final two fraud theories fall outside the scope of this rule because it has alleged that the "misrepresentations" and purported "concealment" were made "to induce NSI to enter into subsequent agreements with NaphCare, and to induce NSI to refrain from seeking to collect outstanding NaphCare Consulting Fees due from NaphCare," respectively.  (Opp. Br. at 19, quoting Compl., ¶ 51.)  But the latter allegation is plainly insufficient to establish a fraud claim independent of the alleged contract; the only reason "success fees" were purportedly due is the alleged terms of the "success fee" contracts on which National Strategies seeks recovery (Pl.'s Compl., ECF No. 1-1, at ¶36), and — while no such duty exists in any document signed by NaphCare — the only theoretical source of a "duty" to "disclose" *public* contracts to National Strategies would be the alleged "success fee" contracts.  Since a tort claim "will exist independently of the contract action only if the breaching party also breaches a duty owed separately from that created by the contract, that is, a duty owed even if no contract existed," *Telxon Corp.*, 2005-Ohio-4931, at ¶34, and NaphCare has no duty to pay "success fees" or "disclose" public contracts in the absence of a (valid) agreement with National Strategies, National Strategies cannot pursue a fraud claim on the theory that NaphCare somehow "induced [National Strategies] to refrain from seeking to collect outstanding NaphCare Consulting Fees due from NaphCare[.]"  (Opp. Br. at 19.)

Nor can National Strategies pursue a fraud claim against NaphCare on the theory that alleged misrepresentations "by way of payment" somehow "induced [National Strategies] to enter into subsequent agreements with NaphCare[.]"  (Opp. Br. at 19.)  Even assuming that "payments" contain an implicit "statement," there is no evidence that National Strategies relied on any such "statements" in entering into any "agreements" with NaphCare.  (ECF No. 36-1,

Mem. in Supp. at 16-17 n. 5.)  The alleged misrepresentations "by way of payment" purportedly relate to the "success fees" that NaphCare paid National Strategies for the Clark County, Nevada contract between *June* 2005 and *July 2009.*  (Opp. Br. at 17.)  But National Strategies' CEO admitted under oath that, as of *November 4, 2004*, "[National Strategies] had absolutely no retainer and no ongoing contract to provide [NaphCare] services." (ECF No. 40, Gordon 11/8/10 Dep. at 121; *see also* Gordon Dep. Exh. 16 ("We have no retainer and no contract.").)  Since National Strategies' relationship with NaphCare ended nearly one year before the first of the alleged misrepresentations "by way of payment," National Strategies cannot establish a fraud claim on the theory that these "misrepresentations" somehow induced National Strategies to enter into additional agreements with NaphCare.  NaphCare is entitled to summary judgment on National Strategies' fraud claim.

### D.      National Strategies Cannot Establish Conversion.

NaphCare's summary judgment motion established that National Strategies' conversion claim fails because it is based on alleged breaches of contract, which are insufficient to give rise to a tort claim for conversion.  (ECF No. 36-1, Mem. in Supp. at 17-18.)  National Strategies makes no independent argument in defense of this claim; it simply asserts that summary judgment should be denied based on the same arguments that National Strategies advanced with respect to its fraud claim.  (Opp. Br. 19.)  Not only do National Strategies' fraud-based arguments fail for the reasons expressed above, but none of those arguments address NaphCare's central point that National Strategies cannot establish a conversion claim based on NaphCare's alleged failure to pay "success fees" purportedly due under the Contract Oversight Fee Schedules.  Accordingly, NaphCare is entitled to summary judgment on this claim as well.

**E.    At a Minimum, National Strategies is Not Entitled to an Injunction Mandating Future Payments.**

In response to National Strategies' position that NaphCare continues to be obligated to pay it annual consulting fees, NaphCare's summary judgment motion included an alternative request for relief establishing that, at a minimum, NaphCare was entitled to summary judgment to the extent that National Strategies intended to seek declaratory relief from this Court in the form of an order directing NaphCare to pay National Strategies on a going-forward basis.  (*See* ECF No. 36-1, Mem. in Supp. at 18-20.)  National Strategies attempts to dodge this point by insisting that it is not seeking an order "directing NaphCare to make future payments," but only an order that National Strategies "is entitled to these future payments[.]"  (Opp. Br. at 19.)  This attempt at evasion, however, elevates form over substance, and should be rejected for the reasons specified in NaphCare's Memorandum in Support.  (*See* ECF No. 36-1, Mem. in Supp. at 18-20.)

**III.    CONCLUSION**

For all of the above reasons, NaphCare is entitled to summary judgment as a matter of law.

Respectfully submitted,

s/*Mark F. McCarthy*
Mark F. McCarthy (0013139)
Benjamin C. Sassé (0072856)
Mary H. Stiles (0083316)
TUCKER ELLIS & WEST LLP
1150 Huntington Building
925 Euclid Avenue
Cleveland, OH  44115-1414
Tel:     216.592.5000
Fax:     216.592.5009
E-mail:  mark.mccarthy@tuckerellis.com
         benjamin.sasse@tuckerellis.com
         mary.stiles@tuckerellis.com

*Attorneys for Defendant NaphCare, Inc.*

15

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that this case has been assigned to the standard track and the Memorandum adheres to the page limitations established in Loc. R. 7.1(f).


<u>s/*Mark F. McCarthy*</u>
Mark F. McCarthy (0013139)
Benjamin C. Sassé (0072856)
Mary H. Stiles (0083316)
TUCKER ELLIS & WEST LLP
1150 Huntington Building
925 Euclid Avenue
Cleveland, OH  44115-1414
Tel:      216.592.5000
Fax:      216.592.5009
E-mail:  mark.mccarthy@tuckerellis.com
             benjamin.sasse@tuckerellis.com
             mary.stiles@tuckerellis.com

*Attorneys for Defendant NaphCare, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on June 17, 2011, a copy of the foregoing **Reply Memorandum in Support of Defendant's Motion for Summary Judgment** was filed electronically.  Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

s/*Mark F. McCarthy*
Mark F. McCarthy (0013139)
Benjamin C. Sassé (0072856)
Mary H. Stiles (0083316)
TUCKER ELLIS & WEST LLP
1150 Huntington Building
925 Euclid Avenue
Cleveland, OH  44115-1414
Tel:       216.592.5000
Fax:      216.592.5009
E-mail:  mark.mccarthy@tuckerellis.com
              benjamin.sasse@tuckerellis.com
              mary.stiles@tuckerellis.com

*Attorneys for Defendant NaphCare, Inc.*

011782.000002.1269986.1