DOWD, J.

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

|  |  |  |
|---|---|---|
| National Strategies, LLC, | ) | CASE NO. 5:10-CV-0974 |
|  | ) |  |
| Plaintiff, | ) |  |
|  | ) | MEMORANDUM OPINION AND |
| v. | ) | ORDER |
|  | ) |  |
| Naphcare, Inc., | ) |  |
|  | ) |  |
| Defendant. | ) |  |
|  | ) |  |

This removed case[1] is a contract dispute involving three separate contracts: the Ohio

Consulting Agreement, the Nevada Consulting Agreement and the New York Consulting

Agreement (collectively, The Consulting Agreements).[2]  Plaintiff National Strategies, LLC (NSI

or National Strategies) alleges that Defendant Naphcare, Inc. (Naphcare) has not paid Plaintiff

for services rendered under The Consulting Agreements in accordance with the terms of those

agreements.

Presently pending before the Court is Defendant's motion for summary judgment

pursuant to Federal Rule of Civil Procedure 56.  ECF No. 36.  Defendant requests summary

judgment on the Plaintiff's claims for:  breach of contract (Count I), unjust enrichment (Count

---

[1] Defendant removed this case from the Summit County Court of Common Pleas on the basis of diversity jurisdiction.  ECF No. 1; 28 U.S.C. § 1332.

[2] For the purposes of this analysis, the Court utilizes the nomenclature contained in Plaintiff's Complaint to identify "The Consulting Agreements."  The Court notes, however, that the actual title of the agreements is "Contract Oversight Fee Schedule by and between National Strategies, Inc. and NaphCare, Inc."  ECF No. 1-1.

(5:10 CV 974)

III), fraud (Count IV), conversion (Count V), and declaratory judgment (Count VI).[3]  Plaintiff

has opposed Defendant's motion for summary judgment (ECF No. 48), and Defendant has

replied (ECF No. 51).

For the following reasons, the Court:

DENIES summary judgment on Count I (breach of contract):

DENIES summary judgment on Count III (unjust enrichment);

GRANTS summary judgment on Count IV (fraud);

GRANTS summary judgment on Count V (conversion); and

DENIES summary judgment on Count VI (declaratory judgment).

## I.  FACTUAL BACKGROUND

Plaintiff National Strategies is a Delaware limited liability company with its principal

place of business located in Washington, D.C.  Plaintiff provides consulting services and assists

clients in obtaining contracts with state and local governments.  In addition to providing their

clients with assistance in understanding and navigating regulations and policies of state and local

governments, Plaintiff "employs a nationwide network of over 2,000 state and local consultants

in every major city and county across the country who have specialize experience and

knowledge of the inner workings of government entities, and personal networks and

relationships with government and influential personnel, in their respective geographic areas."

ECF No. 1-1.

---

[3] Count II for breach of implied covenant of good faith and fair dealing does not appear
to be part of Defendant's motion for summary judgment.

(5:10 CV 974)

For those services, National Strategies is compensated by a fixed fee for services, plus a "success fee."  The "success fee" portion of Plaintiff's compensation is triggered when its clients successfully secure contracts with governmental entities in the geographic region defined by The Consulting Agreements.  The "success fee" can be a fixed amount or a percentage of the revenues received by Defendant for governmental contracts secured in accordance with the terms of The Consulting Agreements.

Defendant Naphcare is an Alabama corporation with its principal place of business located in Alabama.  Defendant provides health care services to government entities, primarily correctional facilities.

The parties do not agree about how the introductions of these two companies occurred. These disputed facts, however, are not a necessary consideration for the purpose of the Court's summary judgment analysis.  The bottom line is that Defendant hired National Strategies to help expand Defendant's business in Ohio, Nevada, and New York, and the parties entered into three separate agreements in that regard: the New York Consulting Agreement (September 10, 2003), the Ohio Consulting Agreement (October 31, 2003), and the Nevada Consulting Agreement (October 31, 2003).  ECF No. 1-1.

The Consulting Agreements provided for payment to Plaintiff of a monthly fee for a specific period of time, in addition to payment of a "success fee" for every contract with a government entity successfully secured by Defendant in the geographic areas defined by The Consulting Agreements.  ECF No. 1-1.  Defendant paid the monthly consultant fees pursuant to The Consulting Agreements.  The dispute in this case involves whether Defendant has paid

(5:10 CV 974)

Plaintiff the "success fees" in accordance with the terms of The Consulting Agreements.

Plaintiff claims that Defendant has not paid the "success fees" in accordance with the terms of

The Consulting Agreements, and in failing to do so, breached the contractswil and engaged in

fraud and conversion with respect to the unpaid funds.

    1.  <u>Ohio Consulting Agreement</u>

    The parties entered the Ohio Consulting Agreement in October 2003.  The Ohio

Consulting Agreement at issue in this case is reproduced in full below:

> The Parties agree that NaphCare shall pay to National Strategies,
> Inc. on the fifteenth or the first business day thereafter *an annual
> fee in the amount of one percent (1%) of the gross receipts of all
> fees received by NaphCare for each Contract to provide
> comprehensive medical services and an annual fee in the amount
> of five percent (5%) of the gross receipts of all fees received by
> NaphCare for each Contract to provide dialysis services*, payable
> on a monthly basis, of fees received by NaphCare (or any affiliate
> or assignee thereof) under any Contract *for the term of the
> Contract and any extensions thereof*.  NaphCare *also agrees* to pay
> National Strategies, Inc. *a monthly fee of Three Thousand Dollars
> ($3,000) for a period of four (4) months commencing October 1,
> 2003.  "Contract" shall mean any agreement, arrangement, or
> understanding to provide healthcare services between NaphCare,
> Inc. and the state of Ohio* (including but not limited to the
> departments, counties, cities, or political subdivisions in the state
> of Ohio) (or any affiliated entity).  (ECF No. 1-1 (emphasis
> added)).

    In September 2004, after the Ohio Consulting Agreement was signed, Defendant secured

a contract with Summit County, Ohio to provide medical services for its inmates.  Defendant

paid Plaintiff the first year of the "success fee" for the Summit County contract.  However, when

the Summit County contract was extended in September 2005 for another year, Defendant did

not continue to pay the "success fee."  The extension of the Summit County contract was

-4-

(5:10 CV 974)

terminated August 8, 2006.

In 2006, Defendant entered into an agreement with Montgomery County to provide

medical services and dialysis services.  Plaintiff also alleges that Defendant later secured a

contract with Hamilton County but that no "success fees" have been paid on these contracts.

2. <u>Nevada Consulting Agreement</u>

The parties entered the Nevada Consulting Agreement in October 2003.  The Nevada

Consulting Agreement in dispute in this case is reproduced in full below:

> The Parties agree that NaphCare shall pay to National Strategies, Inc. on the
> fifteenth or the first business day thereafter *an annual fee in the amount of one
> percent (1%) of the gross receipts of all fees received by NaphCare for each
> Contract*, payable on a monthly basis, of fees received by NaphCare (or any
> affiliate or assignee thereof) under any Contract *for the term of the Contract and
> any extensions thereof.*  NaphCare *also agrees to pay* National Strategies, Inc. *a
> monthly fee of Two Thousand Five Hundred Dollars ($2,500) for a period of six
> (6) months commencing October 1, 2003.  "Contract" shall mean any agreement,
> arrangement, or understanding to provide healthcare services between
> NaphCare, Inc. and Clark County, Nevada* (or any affiliated entity).  (ECF No. 1-
> 1 (emphasis added)).

In January 2005, Defendant secured a contract with Clark County, Nevada to provide

medical services to inmates in the Clark County Detention Center.  From 2005-2009, Defendant

made monthly payments to Plaintiff in the amount of $8,333.33.  Plaintiff contends Defendant

paid less than the agreed 1% of gross payments received by Defendant under the Clark County

Contract, therefore failing to fulfill its "success fee" obligation under the Nevada Consulting

Agreement.  Furthermore, Defendant allegedly terminated the Nevada Consulting Agreement in

2009, and did not pay any additional "success fees" after July 2009.

(5:10 CV 974)

### 3. New York Consulting Agreement

The parties entered the New York Consulting Agreement in September 2003.

The New York Consulting Agreement at issue in this case is reproduced in full below:

> The Parties agree that NaphCare shall pay to National Strategies, Inc. on the fifteenth or the first business day thereafter *an annual fee in the amount of Fifty Thousand Dollars ($50,000) for each Contract in either Central of Eastern region of NYSDOC*, payable on a monthly basis, of fees received by NaphCare (or any affiliate or assignee thereof) under any Contract *for the term of the Contract and any extensions thereof.* NaphCare *also agrees* to pay National Strategies, Inc. *a monthly fee of Three Thousand Dollars ($3,000) for a period of six (6) months commencing September 1, 2003.* "Contract" *shall mean any agreement, arrangement, or understanding to provide dialysis services between NaphCare, Inc. and New York State and the New York State Department of Corrections (NYSDOC) (or any affiliated entity), in either the Central or Eastern region of NYSDOC.* (ECF No. 1-1 (emphasis added)).

In August 2006, Defendant secured a contract with the New York State Department of Corrections to provide health care services to the Fishkill Correctional Facility (Fishkill), and the Wende Correctional Facility (Wende). In its Complaint, Plaintiff alleges that Defendant concealed the existence of the Fishkill contract and has not paid any "success fee" as required under the New York Consulting Agreement.[4]

---

[4] Plaintiff's Complaint also includes the Wende Correctional Facility in its allegations, but the deposition of Plaintiff's chief executive officer later revealed that Defendant's contract with Wende pre-dated its relationship with Plaintiff.

(5:10 CV 974)

## II.  APPLICABLE LAW

A.  <u>Summary Judgment Standard</u>

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.  Federal Rule of Civil Procedure 56(a) provides in the pertinent part that:

> A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.

The United States Supreme Court defined the principles governing motions for summary judgment in a trilogy of cases:  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986), *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986), and *Matsushita Electrical Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986).  The Sixth Circuit expressly adopted the Supreme Court trilogy in *Street v. J.C. Bradford & Co.*, 886 F.2d 1472 (6th Cir. 1989).

To receive summary judgment, the moving party must first establish that there is an absence of genuine issues of material fact, which the moving party may accomplish by demonstrating the nonmoving party lacks evidence to support an essential element of a claim. *Celotex*, 477 U.S. at 323; *see also Williamson v. Recovery Ltd. P'ship*, 2011 U.S. Dist. LEXIS 59584, at *25 (S.D. Ohio 2011); *Barnhart v. Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1388-89 (6th Cir. 1993).  A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson*, 477 U.S. at 248; *see also Pride of the Hills MFG. Inc v. Resources-*

(5:10 CV 974)

*Appalachia, LLC*, 2011 U.S. Dist. LEXIS 59794, at *13 (N.D. Ohio 2011); *Goodyear Tire & Rubber Co. v. Commodity Express Leasing & Sales, Inc.*, 2011 U.S. Dist. LEXIS 44928, at *10 (N.D. Ohio 2011).  Bases on the material facts in the record, the Court must therefore decide "whether reasonable jurors could find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict." *Anderson*, 477 U.S. at 252; *see also Pride of the* Hills, 2011 U.S. Dist. LEXIS 59794 at *13; *Goodyear*, 2011 U.S. Dist. LEXIS 44928 at *10-11.

Once the moving party establishes an absence of genuine issues of material fact, the burden shifts to the non-moving party to demonstrate the existence of a material fact that remains for trial. *Celotex*, 477 U.S. at 323.  "In evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the nonmoving party." *Williamson*, 2011 U.S. Dist. LEXIS 59584 at *25-26 (*citing Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970)); *see also Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) ("the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence").

"Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248.  A genuine issue for trial exists unless "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita*, 475 U.S. at 587.

(5:10 CV 974)

Furthermore, in *Anderson*, the Supreme Court held:

> The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff. The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of evidence that the plaintiff is entitled to a verdict.

477 U.S. at 252.

Thus, the "mere possibility" of a factual dispute is not enough.  *Gregg v. Allen-Bradley Co.*, 801 F.2d 859, 863 (6th Cir. 1986).  Where the defendant demonstrates that after a reasonable period of discovery the plaintiff is unable to produce sufficient evidence beyond the bare allegations of the complaint to support an essential element of his case, summary judgment should be granted.  *Celotex*, 477 U.S. at 325-26; *see also Street*, 886 F.2d at 1478-80.

In sum, "[t]he inquiry performed is the threshold inquiry of determining whether there is the need for a trial -- whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."  *Anderson*, 477 U.S. at 250.  This Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Id.* at 251-52; *see also Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 578 (6th Cir. 2003) ("[t]he conflicting proof and the inferences that can be drawn therefrom raise genuine issues of material fact that preclude the grant of summary judgment").

(5:10 CV 974)

B. <u>What Law Applies</u>

"A federal Court exercising diversity jurisdiction applies the choice of law rules of the state in which it sits." *Faurecia Automotive Seating*, 579 F. Supp. 2d 967, 970 (N.D. Ohio 2008) (*citing Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)); *Andersons, Inc. v. Consol, Inc.*, 348 F.3d 496, 501 (6th Cir. 2003) ("In diversity cases, the district court is to apply the choice of law rules of the state in which the court sits."); G*irgis v. Countrywide Home Loans, Inc.*, 733 F. Supp. 2d 835, 850 (N.D. Ohio 2010). In this case, the forum state is Ohio. Therefore, Ohio's choice of law rules therefore govern what law will apply to each of The Consulting Agreements.

Ohio has generally adopted the choice of law rules set forth in the Restatement of Law 2d, Conflict of Laws. *Pevets v. Crain Communications, Inc.*, 2100 2175066 (Ohio App. 6. Dist.). The Court will address below each section of the Restatement of 2d applicable to Plaintiff's various claims. While the specific factors of each applicable Restatement section differ, the choice of law focus is generally on the state with the most significant relationship to the particular claims at issue.

III. ANALYSIS

A. <u>Breach of Contract and Declaratory Judgment Claims (Counts I and VI)</u>

Defendant seeks summary judgment on Plaintiff's breach of contract claim (Count I) on the grounds that the "success fee" provisions in The Consulting Agreements are void as against state public policy. ECF No. 36. The Consulting Agreements do not contain choice-of-law provisions. Defendant also seeks summary judgment on Count VI, Plaintiff's declaratory

(5:10 CV 974)

judgment claim pursuant to Ohio Revised Code §§ 2721.01 *et seq.*[5]  ORC §§ 2721.01 *et seq.*

permits the Court to declare rights, status, and other legal relations, regardless of whether or not

further relief is or could be claimed.

Because the Consulting Agreements do not designate the law to govern contract disputes,

Ohio's choice-of-law  rules govern and provides that the validity of contracts will be determined

according to the law  of the state where the services are to be performed.  *See* Restatement

(Second) of Conflict of Laws § 196 (1971) ("The validity of a contract for the rendition of

services and the rights created thereby are determined . . . by the local law of the state where the

contract requires that the services, or a major portion of the services, be rendered, unless, with

respect to the particular issue, some other state has a more significant relationship"); *see Gries*

*Sports Enterprises v. Modell*, 15 Ohio St. 3d 284, 287 (Ohio 1984)*;  Macurdy v. Sikov & Love,*

*P.A.*, 894 F.2d 818, 822 (6th Cir. 1990).  Accordingly, this contract dispute is governed by the

applicable laws of the states in which Plaintiff's services were performed:  Ohio, Nevada, and

New York.

The basis for Defendant's summary judgment motion on Plaintiff's contract and

declaratory judgment claims is that "success fees" for lobbying services are against public policy

---

[5]  "Subject to division (B) of section 2721.02 of the Revised Code, a contract may be construed
by a declaratory judgment or decree either before or after there has been a breach of the
contract."  ORC § 2721.04 (2011); *see also* 35 Ohio Jur. Declaratory Judgments and Related
Proceedings § 21 (2011) ("Any person interested under a written contract or other writing
constituting a contract, or whose rights, status, or other legal relations are affected by a contract,
may have determined any question of construction or validity arising under that contract and
obtain a declaration of rights, status, or other legal relations thereunder.  A contract may be
construed by a declaratory judgment either before or after there has been a breach").

(5:10 CV 974)

in Ohio, Nevada, and New York, and therefore defendant is entitled to summary judgment on

Plaintiff's breach of contract and declaratory judgment claims for all three agreements.

     1.  *Ohio Consulting Agreement*

Plaintiff claims that Defendant's contracts to provide health care services to Summit

County, Montgomery County, and Hamilton County are subject to the "success fee" provision of

the Ohio Consulting Agreement.

In its motion for summary judgment, Defendant argues that the "success fee" provision

of the Ohio Consulting Agreement is void as against Ohio public policy.  In support, Defendant

cites *Winpenny v. Maynard French*, 18 Ohio St. 469, 475-76 (1869) (citing *The Tool Company v.*

*Norris*, 2 Wallace R. 45) and Ohio's statutory prohibitions against contingent fees contained in

Ohio's legislative lobbying and executive agency lobbying acts.[6]

Ohio Revised Code Section 101.77 prohibits contingent fee arrangements with respect to

the success of legislative lobbying efforts.[7]  "Legislation" is defined by Section 101.70(B) as a

"matter pending before the general assembly."

---

[6] Ohio Revised Code Sections 101.77 (Legislative Lobbying Act) and 121.67(A) (Executive Agency Lobbying Act).

[7] No person shall engage any person to actively advocate in exchange for compensation that is *contingent in any way upon the passage, modification, or defeat of any legislation*.  No person shall accept any engagement to actively advocate in exchange for compensation that is contingent in any way upon the passage, modification, or defeat of any legislation.

O.R.C. § 101.77 (2011) (emphasis added).

-12-

(5:10 CV 974)

Ohio Revised Code Section 121.67(A) prohibits contingent fee arrangements dependant upon a lobbyist's success in influencing executive agency decisions.[8]  Section 121.60(F) defines an "executive agency" to mean the office of an elected executive official, department created under Section 121.01, or other state agency, department, board or commission controlled or directed by an elected official, and Section 121.60(G) defines an executive agency decision as the decision of an executive agency regarding the expenditure of the funds of the state or of an executive agency with respect to the award of a contract, grant, lease or other financial arrangement.  Defendant reasons that these statutes and *Winpenny* support a conclusion by this Court that Ohio has a public policy against contingent fees with respect to the procurement of government contracts in general, and the Court should extend and apply that public policy to invalidate Defendant's contracts with various Ohio counties.

The Court does not find *Winpenny* persuasive as a basis for concluding that the Ohio Consulting Agreement is invalid as against public policy.  *Winpenny* involved a contract which that court concluded did <u>not</u> violate of public policy, and distinguished the facts in *Winpenny* from *The Tool Company v. Norris*, 2 Wallace R. 45, in which a contingent fee for procurement

_____

[8] Except as provided in division (B) of this section, no person shall engage any person to *influence executive agency* decisions or conduct executive agency lobbying activity *for compensation that is contingent in any way on the outcome of an executive agency decision* and no person shall accept any engagement to influence executive agency decisions or conduct executive agency lobbying activity for compensation that is contingent in any way on the outcome of an executive agency decision.

O.R.C. § 121.67(A) (2011) (emphasis added).

-13-

(5:10 CV 974)

of a government contract where there was no public bidding "suggest[ed] the use of sinister and corrupt means." Further, contracts with counties[9] do not fall within the plain language of the contingent fee prohibitions of either Ohio's Legislative Lobbying Act or Executive Agency Lobbying Act and are not void as against public policy on that basis.[10]

Accordingly, Defendant's motion for summary judgment and declaratory relief on the basis that the Ohio Consulting Agreement is void as against Ohio public policy is DENIED.

2. *Nevada Consulting Agreement*

Plaintiff claims that the contract between Naphcare and Clark County, Nevada, is subject to the "success fee" provision of the Nevada Consulting Agreement.

Defendant argues in support of its motion for summary judgment that the "success fee" provision of the Nevada Consulting Agreement is void as a matter of public policy based on the prohibition against contingent fees contained in Nevada's Revised Statute Section 218H.930(4), which provides: "A person who employs or uses a lobbyist shall not make that lobbyist's

---

[9] The "success fee" provision of the Ohio Consulting Agreement applies to "contracts" with defendant NaphCare and "the state of Ohio (including, but not limited to departments, counties, cities . . . )." The Court notes that application of the "success fee" provision to a future contract between NaphCare and a "department" that falls within the Ohio Revised Code Section 121.67(A) may run afoul of the statute.

[10] When a statute defines the terms used therein, that definition controls the application of the statute. *Good Samaritan Hosp. v. Porterfield*, 29 Ohio St.2d 25, 30 (1972). It is the Court's responsibility to enforce the "literal language of a statute" and to "interpret, not legislate." *Cablevision of the Midwest, Inc. v. Gross*, 70 Ohio St.3d 541, 544 (1994). *See also*, *Mills v. Tekni-Plex*, 2011 2076469 at *5 (N.D. Ohio). In the Court's view, any expansion of these statutes to include county contracts is a matter for the legislature of the State of Ohio.

-14-

(5:10 CV 974)

compensation or reimbursement *contingent in any manner upon the outcome of any legislative action.*"  (Emphasis added).

The Nevada Lobbying Disclosure Act defines "lobbyist" as a person who "[c]ommunicates directly with a member of the Legislative Branch on behalf of someone other than himself or herself to influence legislative action."  Nev. Rev. Stat. § 218H.080(1)(a)-(b). The Nevada Act defines "legislative action" as official actions on matters "pending or proposed in a legislative committee or in either House of the Legislature, or on any matter which may be the subject of action by the Legislature."  Nev. Rev. Stat. § 218H.070.

In its motion for summary judgment, Defendant does not contend that the that the Clark County contract involved legislative action.  Rather, Defendant invites the Court to "strike down a contract on public policy grounds even if the particular lobbying activities at issue do not fall within the four-corners of the legislative prohibition."  ECF 36-1.

Contracts with counties clearly do not fall within the plain language of the contingent fee prohibitions of Nevada's Lobbying Disclosure Act and are not void as a against public policy on that basis.  The Court declines to extend the contingency fee prohibition contained in this statute to county contracts.[11]

---

[11] "Generally, when this court interprets a statute, if 'the language . . . is plain and unambiguous, and its meaning clear and unmistakable, there is no room for construction, and the courts are not permitted to search for its meaning beyond the statute itself.'" *Hamm v. Arrowcreek Homeowners' Ass'n*, 124 Nev. 18, 183 P.3d 895, 899 (Nev. 2008)(quoting *State v. Jepsen*, 46 Nev. 193, 196, 209 P. 501, 502 (1922)).  In the Court's view, any expansion of this statute is a matter for legislature of the State of Nevada.

(5:10 CV 974)

Accordingly, Defendant's motion for summary judgment and declaratory relief on the basis that the Nevada Consulting Agreement is void as against Nevada public policy is DENIED.

3. *New York Consulting Agreement*

Plaintiff claims that the contract for Fishkill is subject to the "success fee" provision of the New York Consulting Agreement and that Defendant has not paid the "success fee" in accordance with the terms of that agreement.

In its motion for summary judgment, Defendant argues that the "success fee" provision of the New York Consulting Agreement is void as against New York public policy.  In support, Defendant cites the current version of the New York Lobbying Act, N.Y. Legislative Law § 1-k, which provides in relevant part that: "No client shall retain or employ any lobbyist for compensation, the rate or amount of which compensation in whole or in part is dependant upon . . .. any determination by a state agency . . . with respect to a governmental procurement." Section 1-k(a)(3).[12]  It is undisputed that National Strategies' services to Naphcare in New York to expand Naphcare's business opportunities included lobbying efforts with the New York governor's office and "the program person for corrections, criminal justice, attended the meetings as well."  Gordon Dep. ECF No. 43, pp. 5-11, 21; Harrison Dep., ECF No. 49-4, pp. 172 - 180.

---

[12] The definition of "lobbyist" and "lobbying" applicable to the current version of § 1-k includes a person or organization retained by a client to attempt to influence any determination by a public official or agent related to a governmental procurement.

(5:10 CV 974)

Plaintiff opposes Defendant's motion for summary judgment. In opposing the motion, Plaintiff points out that the relevant provision of New York's law § 1-k prohibiting the use of contingent retainers to influence government procurement contracts was not in effect until January 1, 2006, which was undisputedly after the parties entered into the New York Consulting Agreement and after lobbying efforts on behalf of Naphcare under that agreement were concluded. As a consequence, Plaintiff argues that the New York Consulting Agreement is not unlawful because § 1-k does not specifically provide for retroactive application or for the invalidation of contingent fee retainers.[13]

In support of retroactive application of the New York Lobbying Act's contingent fee provision regarding government procurement, Defendant cites *Bloomfield v. Bloomfield* for the proposition that retroactive application of the law is appropriate for the invalidation of the New York Consulting Agreement based on public policy. *Bloomfield v. Bloomfield*, 97 N.Y.2d 188, 194 (N.Y. 2001) ("The general principle that the validity of a contract depends upon the law that existed at the time the contract was made does not appertain to variations of the law that are made due to changes in public policy.").

Plaintiff argues that *Bloomfield* is not applicable in this case because the facts in *Bloomfield* involved an analysis of a prenuptial agreement on the topic of support which may have been illegal when made but which later became legal after a change in the law. In this case, the issue is whether a contract for contingent retainer employment of a lobbyist to influence

---

[13] For the purposes of this analysis, the Court will also assume that it is undisputed that National Strategies or lobbyist John Cordo performed no services for defendant Naphcare after January 1, 2006.

-17-

(5:10 CV 974)

governmental procurement that was legal when made can become illegal due to a subsequent change in the New York Lobbying Act.

The Court finds that there is an insufficient basis to invalidate the New York Consulting Agreement based on retroactive application of a change in the New York Lobbying Act which, on its face, does not provide for retroactive application.  First, the language in *Bloomfield* upon which Defendant relies to support invalidation of the New York Consulting Agreement was not the basis for the court's decision in that case, having issued its ruling on other grounds.  Second, retroactive application of a statue is generally contrary to the "well settled" principle that "contracts made by private parties must necessarily be construed in light of the applicable law at the time of their execution."  *Goldfarb v. Goldfarb*, 86 A.D. 459, 461 (1982).  Third, while there is a limited basis in New York case law for retroactive application of legislation to render an illegal contract legal, the courts disfavor use the invalidation of a contract by operation of law, particularly when the defaulting party raises illegality as a sword rather than as a shield. *Goldfarb v. Goldfarb*, 86 A.D. at 461-62; 22 N.Y. Jur.2d § 195.

As a consequence, the Court concludes that the New York Lobbying Act does not apply retroactively to invalidate the New York Consulting Agreement as a matter of law.  Accordingly, Defendant's motion for summary judgment as to the New York Consulting Agreement is DENIED.

-18-

(5:10 CV 974)

    B.  Unjust Enrichment (Count III)

    Section 221 of the Restatement of the Law 2d Conflict of Laws identifies the following

factors to be considered in analyzing the parties' contacts with the various jurisdictions to

determine the applicable choice of law for an unjust enrichment claim:

> (a) the place where a relationship between the parties was
> centered, provided that the receipt of enrichment *was substantially
> related to the relationship*, (b) the place where the benefit or
> enrichment was received, (c) the place where the act conferring the
> benefit or enrichment was done, (d) the domicile, residence,
> nationality, place of incorporation and place of business of the
> parties, and (e) the place where a physical thing, such as land or a
> chattel, which was substantially related to the enrichment, was
> situated at the time of the enrichment.   Restat 2d of Conflict of
> Laws, § 221 (emphasis added).

    In this case, Plaintiff is incorporated in Delaware with its principal place of business in

Washington D.C.  Defendant is incorporated in Alabama, which is also Defendant's principal

place of business and where a meeting between the two companies took place regarding their

business arrangements.  However, the services were performed and benefits of these contracts

were received in each of the three jurisdictions at issue.  For similar reasons that the Court

concluded that laws of Ohio, Nevada and New York applied respectively to the contract analysis

of the Ohio, Nevada and New York Consulting Agreements, the Court also concludes that each

of these states has the most significant relationship to Plaintiff's unjust enrichment claims for the

purpose of determining the correct law to be applied.

    Plaintiff pleads its unjust enrichment claims as an alternative to its breach of contract

claims.  Unjust enrichment is available in the absence of an express contract.  The elements of an

(5:10 CV 974)

unjust enrichment claim in Ohio, Nevada and New York are very similar in all three

jurisdictions.  The three basic elements are: i) plaintiff conferred a benefit upon defendant; ii)

defendant knew of the benefit; and iii) defendant retained the benefit under circumstances where

it would have been unjust to do so without payment.  *Andersons, Inc. v. Consol, Inc.*, 348 F.3d

496, 501 (6th Cir. 2003) (citing *Brown-Graves Co. v. Obert*, 98 Ohio App.3d 517 (1994));

*Wuliger v. Manufacturers Life Ins. Co.* 567 F.3d 787, 799 (6th Cir. 2009) ("Ohio law is clear that

a plaintiff may not recover under a theory of unjust enrichment . . . when an express contract

covers the same subject"); *Styles v. State Farm Mut. Auto. Ins. Co.*, 2007 WL 1435005)(citing

*Leasepartners Corp. v. Robert L. Brooks Trust Dated Nov. 12, 1975*, 942 P.2d 182, 187 (Nev.

1997) (unjust enrichment is not available when there is an express written contract)); *Beth Isr.*

*Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J., Inc.*, 448 F.3d 573, 586 (2d Cir. N.Y.

2006) ("To prevail on a claim for unjust enrichment in New York, a plaintiff must establish (1)

that the defendant benefitted; (2) at plaintiff's expense; and (3) that equity and good conscience

requires restitution. . . . It is important to note . . . an unjust enrichment claim in New York lies

as a quasi-contract claim.  It is an obligation the law creates in the absence of any agreement."

(internal citations and quotations omitted)).

The Court has concluded, *supra*, that Defendant is not entitled to judgment as a matter of

law on Plaintiff's claims for breach of contract and declaratory judgment with respect to The

Consulting Agreements.  Therefore, it is not appropriate to grant summary judgment on

Plaintiff's unjust enrichment claims until the merits of Plaintiff's breach of contract claims are

determined and an analysis performed in light of that determination.

-20-

(5:10 CV 974)

Accordingly, Defendant's motion for summary judgment on Plaintiff's claim for unjust enrichment is DENIED.

C. <u>Fraud (Count IV)</u>

Defendant asserts that it is entitled to summary judgment as a matter of law because Plaintiff's fraud claim (Count IV) is insufficiently pled under the requirements of Federal Rule of Civil Procedure 9(b). Alternatively, Defendant argues that even if Plaintiff's fraud claim is pled with particularity, Plaintiff's allegations do not constitute actionable fraud.

Plaintiff bases its fraud claim on three alleged statements or omissions:

> (1) statements by Naphcare's Chief Executive Officer James S. McLane that Naphcare would pay NSI for services provided and to be provided in the future; (2) representations by way of payment that Naphcare's payments to NSI under the Nevada Consulting Agreement represented the full one percent (1 %) of the gross fees Naphcare received under the Clark County Contract; and (3) concealing from NSI, while under a duty to disclose, that Naphcare had entered into government contracts (other than the Clark County Contract and Summit County Contract) that would trigger the payment requirements of the Naphcare Consulting Agreements.

ECF No. 1-1.

1. *Fraud allegations pled with particularity*

Federal Rules of Civil Procedure 9(b) requires fraud claims to be stated with "particularity." The Sixth Circuit interprets Rule 9(b) liberally, requiring the claimant to assert at a minimum the "time, place, and content of the alleged misrepresentation on which he or she relied; the fraudulent scheme; the fraudulent intent of the defendants; and the injury resulting from the fraud." *Advocacy Org. for Patients & Providers v. Auto Club Ins. Ass'n.*, 176 F.3d 315, 322 (6th Cir. 1999)(citation omitted). Particularity includes "at a minimum, the time, place and content of the misrepresentation." *CNH America LLC v. International Union, et al.*, ---F.3d---,

(5:10 CV 974)

2011 WL 1833292 (C.A. 6 Mich.) (citing *United States ex rel. Poteet v. Medtronic, Inc.*, 552

F.3d 503, 518 (6th Cir. 2009)).

Assuming for the purpose of this analysis that the issue of particularity under Rule 9(b)

has not been waived, the Court concludes that when construed liberally and considered in its

entirety, the Complaint contains enough specific information regarding the time, place and

content of the alleged fraud to enable Defendant to prepare an informed responsive pleading.

*See United States ex rel. Poteet v. Medtronic, Inc.*, 552 F.3d 503, 518 (6th Cir. 2009).

Accordingly, the Court concludes that it is not appropriate to grant Defendant's motion for

summary judgment on Count IV on the basis that Plaintiff has failed to plead its fraud claim with

particularity in accordance with the requirements of Rule 9(b).

2.     *Fraud claims not actionable*

Applying Ohio's choice of law rules regarding which law applies to Plaintiff's fraud

claims, Section 148 of the Restatement of the Law 2d Conflict of Laws identifies in pertinent

part the following factors to be considered in analyzing the parties' contacts with the various

jurisdictions to determine the choice of law for claims of tortious fraud and/or misrepresentation:

> . . . .
>
> (2) When the plaintiff's action in reliance took place in whole or in part in a state
> other than that where the false representations were made, the forum will consider
> such of the following contacts, among others, as may be present in the particular
> case in determining the state which, with respect to the particular issue, *has the
> most significant relationship* to the occurrence and the parties:  (a) the place, or
> places, where the plaintiff acted in reliance upon the defendant's representations,
> (b) the place where the plaintiff received the representations, (c) the place where
> the defendant made the representations, (d) the domicile, residence, nationality,
> place of incorporation and place of business of the parties, (e) the place where a
> tangible thing which is the subject of the transaction between the parties was

-22-

(5:10 CV 974)

situated at the time, and (f) the place where the plaintiff is to render performance under a contract which he has been induced to enter by the false representations of the defendant.  Restat 2d of Conflict of Laws, § 148 (emphasis added).

(a) <u>statements by Naphcare's Chief Executive Officer James S. McLane that Naphcare would pay NSI for services provided and to be provided in the future</u>

The first fraudulent statement claimed by Plaintiff allegedly took place in Alabama at a meeting between the principals of Plaintiff and Defendant before any of The Consulting Agreements existed between the parties.  According to the declaration of Chief Executive Officer of Plaintiff, Alfred Gordon (ECF 50-1):

On July 16, 2003, I traveled to Birmingham, Alabama and met with James McClane, Chief Executive Officer of NaphCare and NaphCare President Lee Harrison, and Charles Zanaty, another representative of NaphCare.  During this meeting, I described the services that NSI could provide to NaphCare, and I also informed NaphCare of our compensation models . . . and Mr. McLane stated, "if NSI could win me a contract for thirty years, I will pay your for thirty years. . ." (ECF No. 50-1, par. 7).

Neither the alleged fraudulent statement by McLane or the statement attributed to McLane by Gordon distinguishes between payment of monthly contractual fees and "success fees."  Plaintiff alleges that this statement was "specifically designed to deceive [Plaintiff], to induce [Plaintiff] to provide services for the benefit of [Defendant], [and] to induce [Plaintiff] to enter into subsequent agreements with [Defendant]."  ECF No. 1-1, par. 51.  Plaintiff further alleges that at the time Defendant made these statements, "it knew such statements and omissions were false" and that Plaintiff relied to its detriment on the false statements.  ECF No. 1-1, par. 52 and 53.

-23-

(5:10 CV 974)

When considering the proper choice of law to apply to the analysis with respect to this fraud claim, the Court notes that while McLane's alleged statement took place in Alabama, the statement allegedly induced Plaintiff into entering contracts for New York, Ohio and Nevada. Therefore when considering whether Alabama or the contract states have the most significant relationship to Plaintiff's fraud claim regarding McLane's alleged statement, the Court finds that the appropriate focus is where Plaintiff acted in reliance upon Defendant's alleged fraud and misrepresentation and where the services were performed pursuant to agreements that Plaintiff was allegedly induced to enter.  The other alleged statements and omissions clearly have the most significant relationship to the states where the contracts at issue were performed. Accordingly, the Court concludes that the individual states which were the subject of The Consulting Agreements where Plaintiff's services were performed, and where Plaintiff relied on Defendant's alleged statements and omissions in performing the services, have the most significant relationship to Plaintiff's fraud claims.

The parties agree that fraud regarding a future action, occurrence or conduct is only actionable when at the time the individual makes the statement he has no intention of keeping the promise.  *Williams v. Edwards*, 129 Ohio App. 3d 116, 124 (1998); *Deerfield Comms. Corp. v. Chesebrough-Ponds, Inc.,* 502 N.E. 2d 1003, 1004 (N.Y. 1986) (a promise made with present intent not to perform is actionable fraud (quoting *Sabo v. Delman*, 143 N.E.2d 906, 908-09 (N.Y. 1957)); *Bulbman, Inc. v. Nevada Bell*, 108 Nev. 105, 110-12 (1992) (mere failure to fulfill promise or perform in the future will not give rise to a fraud claim absent evidence the promisor

-24-

(5:10 CV 974)

had no intention to perform at the time the promise was made); *Las Vegas Sands v. Suen*, 2010 WL 4673567 (Nev.)(citing *Bulbman, Inc. v. Nevada Bell*, 108 Nev. 105, 110-11 (1992)).

Defendant argues in its motion for summary judgment that there is no evidence in the record that McLane promised payment with no present intention to perform. Further, Defendant points out that Plaintiff concedes in its Complaint and in the Declaration of its Chief Executive Officer that Defendant actually made some "success fee" payments to Plaintiff in accordance with the terms of The Consulting Agreements. See ECF No. 1-1, par. 13, 22; Gordon Dec., ECF No. 50-1, par. 20 and 25. In an absence of any evidence that McLane had not intention of paying "success fees" when he made the allegedly fraudulent statement, Defendant concludes that Plaintiff cannot prove its fraud claim with respect to this statement and the Defendant is entitled to judgment as a matter of law.

In opposition to the motion for summary judgment, Plaintiff reasserts its allegations and argues that whether McLane had a present intent not to pay is a question of fact for the jury. However, Plaintiff does not advance any facts or evidence in the record to rebut Defendant's argument from which a jury could reasonably find that McLane's statements were made with the intention not to perform. *See Anderson*, 477 U.S. at 252 ("there must be evidence on which the jury could reasonably find for the plaintiff"). Further, the undisputed evidence in the record that Defendant paid at least some "success fees" in accordance with the terms of The Consulting Agreements undermines Plaintiff's contention that McLane had no intention to perform at the time he made the alleged fraudulent statements.

(5:10 CV 974)

Therefore, the Court finds that Plaintiff has not met its burden under Rule 56 and there is no evidence in the record from which a jury could reasonably find for Plaintiff regarding McLane's alleged fraudulent statement.  *Celotex*, 477 U.S. at 323.  Accordingly, Defendant is entitled to judgment as a matter of law with respect to Plaintiff's fraud claim concerning the statements by Naphcare's Chief Executive Officer James S. McLane that Naphcare would pay NSI for services provided and to be provided in the future.

> (b) representations by way of payment that Naphcare's payments to NSI under the Nevada Consulting Agreement represented the full one percent (1 %) of the gross fees Naphcare received under the Clark County Contract; and, concealing from NSI, while under a duty to disclose, that Naphcare had entered into government contracts (other than the Clark County Contract and Summit County Contract) that would trigger the payment requirements of the Naphcare Consulting Agreements

The remaining two false and misleading statements and omissions alleged by Plaintiff claim that: (i) Defendant did not pay Plaintiff the proper amount of "success fee" owed on the Clark County Contract and the very payment itself was a false and misleading representation that the amount was correct; and (ii) Defendant concealed from NSI that Defendant had secured certain government contracts and did not pay any "success fees" at all with respect to those concealed contracts, including the Fishkill contract.

A claim for fraud cannot be predicated on a breach of a contractual duty.  Otherwise every breach of contract would also create a tort cause of action.  "A tort claim based upon the same actions as those upon which a claim of contract breach is based will exist independently only if the breaching party also breaches a duty owed separately from that created by the contract, that is, a duty owed even if no contract existed."  *Textron Financial Corp. v.*

(5:10 CV 974)

*Nationwide Mutual Ins. Co.*, 115 Ohio App.3d 137, 151 (1996); *King v. Hertz Corp.*, 2011 WL 1297266 at *2 (N.D. Ohio)(citing *Textron Financial Corp. v. Nationwide Mutual Ins. Co.*, 115 Ohio App.3d 137).  Even an intentional breach does not convert a breach of contract claim into a tort claim.  *Textron Financial Corp. v. Nationwide Mutual Ins. Co.*, 115 Ohio App.3d at 151-52 ("The additional allegation of an intentional failure to obtain Textron's consent to the upgrade by claiming concealment does not change the contractual nature of Textron's claim . . . [c]hanging the characterization of the allegation . . . from "failure to obtain consent" to "concealment" of the sublease does not change the ultimate nature of the action as one for breach of contract.").

Fraudulent inducement is an independent legal duty that is considered outside of the contract, takes place <u>prior</u> to the breach of a contractual obligation at a time when the parties enter the contract, and requires the Plaintiff to show that the Defendant made a knowing material misrepresentation with the intent of inducing the Plaintiff's reliance. *King v. Hertz Corp.*, 2011 WL 1297266 at *3-*7 (N.D. Ohio); *Balta v. Ayco Co.*, 626 F.Supp.2d 347, 360 (W.D. New York 2009) ("Under New York law, a tort cause of action generally does not lie where it is duplicative of a claim sounding in contract.  However, an actionable tort may exist when . . . the defendant breached a duty independent of the contract."); *Yerington Ford, Inc. v. General Motors Acceptance Corp.*, 359 F. Supp. 2d 1075, 1083 (D. Nev. 2004) (violation of a duty to perform imposed by contract cannot be the basis of a tort claim unless duty alleged to be violated is independent, not arising from the contract; fraudulent inducement is an independent tort claim where the fraud occurs prior to formation of the contract rather than in the performance of

(5:10 CV 974)

contractual provisions), *rev'd Giles v. General Motors Acceptance Corp.*, 494 F.3d 865, 880 (9th

Cir. 2007)(holding lower court improperly dismissed fraud claims).

### (i) Clark County "success fee" payments

Plaintiff claims that the "success fees" paid by Defendant for the Clark County Contract

was less than the amount agreed upon by the parties in the Nevada Consulting Agreement, and

that the payments themselves were misrepresentation that induced Plaintiff to provide services to

Defendant and induced Plaintiff to refrain from collecting outstanding fees.[14]  Payment of  the

correct fee under the Nevada Consulting Agreement arises from Defendant's contractual

obligations and not from an independent duty.

However, even were the Court to conclude that by allegedly underpaying the Clark

County Contract "success fee" Defendant violated some duty independent of Defendant's

contractual obligations under the Nevada Consulting Agreement, Plaintiff has not advanced

evidence in the record from which a reasonable jury could find that Plaintiff established the

elements of a fraudulent inducement claim.  Beyond reasserting its allegations of intentional

fraud in opposition to Defendant's motion for summary judgment, Plaintiff advances no

evidence that Defendant made a knowing material misrepresentation with the intent of inducing

the Plaintiff's reliance.  Further, the payment of these fees occurred after the Nevada Consulting

Agreement was formed, and did not induce Plaintiff to provide additional services to Defendant

---

[14] Defendant entered into a contract with Clark County, Nevada in January 2005 to provide health care services as a result of Plaintiff's efforts.  Plaintiff does not dispute that from June 2005 to July 2009, Defendant paid Plaintiff $8,333.33 per month in success fees on the Clark County Contract.

(5:10 CV 974)

because there were no further contracts executed between Plaintiff and Defendant after November 2004.  Gordon Dep. (ECF No. 40) p. 121-22.

The Court finds that Plaintiff's claim that Defendant did not pay the correct amount of "success fee" on the Clark County Contract based pursuant to the terms of the Nevada Consulting Agreement, even if true, did not breach a duty independent of Defendant's duty under the Nevada Consulting Agreement, and is merely a breach of contract claim cloaked in the language of tort.  Further, even if Defendant had some duty regarding "success fee" payments independent of the Nevada Consulting Agreement, Plaintiff has advanced not advanced evidence in the record that supports the elements of fraudulent inducement.  Accordingly, the Court concludes that Defendant is entitled to summary judgment as a matter of law with respect to Plaintiff's fraud allegations regarding the Clark County Contract.

*(ii) Fishkill and other "concealed" contracts*

Plaintiff also claims that Defendant fraudulently concealed its contract with Fishkill (August 2006) and other Ohio contracts secured by Defendant that are allegedly subject to "success fee" payments pursuant to The Consulting Agreements.  Similar to its allegations regarding payment of the incorrect amount of "success fee" for the Clark County, Plaintiff claims that Defendant knowingly concealed contracts to which Plaintiff was entitled to a "success fee" payment under The Consulting Agreements, and that as a consequence, Defendant was induced to enter to enter subsequent agreements with Defendant and induced to refrain from collection efforts.

(5:10 CV 974)

For the same reasons as discussed above, the Court finds that Plaintiff's claims regarding non-payment of "success fees" sound in contract and not in tort.  Plaintiff's efforts to change the characterization of the allegation against Defendant for failure to pay the "success fee" in accordance with the terms of The Consulting Agreements to concealment does not change the ultimate nature of the action as one for breach of contract.  Accordingly, the Court concludes that Defendant is entitled to summary judgment as a matter of law with respect to Plaintiff's fraud allegations regarding non-payment of "success fees" for the Fishkill and other contracts.

Defendant's motion for summary judgment on Count IV is GRANTED.

D.  <u>Conversion (Count V)</u>

In Count V of its Complaint, Plaintiff alleges that Defendant's failure to pay and retention of fees owed Plaintiff pursuant to The Consulting Agreement constitutes conversion. ECF No. 1-1.  Defendant asserts that it is entitled to judgment as a matter of law on Count V because Plaintiff's conversion claim is based on the same allegations as its breach of contract claim and will not lie unless Plaintiff asserts that Defendant breached a duty independent of the contract.

Section 147 is the applicable controlling choice of law for tort claims of conversion.  It explains that:

> In an action for an injury to land or [conversion], the local law of the state where the injury occurred determines the rights and liabilities of the parties unless, with respect to the particular issue, some other state *has a more significant relationship* under the principles stated in § 6 to the occurrence, the thing and the parties, in which event the local law of the other state will be applied. Restat 2d of Conflict of Laws, § 147 (emphasis added).

-30-

(5:10 CV 974)

For reasons previously discussed, the Court concludes that the states where the contracts were performed have the most significant relationship to the parties and the alleged occurrence with respect to the conversion claim.

The tort of conversion is defined as:  "an exercise of dominion or control wrongfully exerted over property in denial of or under a claim inconsistent with the rights of another."  *Dice v. White Finally Cos.*, 878 N.E.2d 1105, 1108-09 (Ohio Ct. App. 2007); *Wantz v. Redfield*, 74 Nev. 196, 198 (Nev. 1958) ("A conversion is defined as a distinct act of dominion wrongfully exerted over another's personal property in denial of, or inconsistent with his title or rights therein or in derogation, exclusion, or defiance of such title or rights"); *Schwartz v. Schwartz*, 81 Misc. 2d 177, 179 (N.Y. Civ. Ct. 1974) ("A conversion is defined as 'any distinct act of dominion wrongfully exerted over another's personal property in denial or inconsistent with his rights therein'" *Meyer v. Price*, 250 N.Y. 370, 381 (N.Y. 1929); *Nat Koslow, Inc. v. Bletterman*, 23 Misc. 2d 340, 342 (N.Y. Sup. Ct. 1960)).

In order to make out a claim for conversion, a plaintiff must establish "(1) plaintiff's ownership or right to possession of the property at the time of the conversion; (2) defendant's conversion by a wrongful act or disposition of plaintiffs property rights; and (3) damages."  *Dice* 878 N.E.2d at 1109 (internal quotations omitted); *Williamson*, 2011 U.S. Dist. LEXIS 59584 at *51 (S.D. Ohio 2011); *see also McCaughey v. Garlyn Shelton, Inc.*, 208 Fed. App'x 427, 435 (6th Cir. 2006); *Galion Cmty. Hosp. v. Hartford Life & Accident Ins. Co.*, 2010 U.S. Dist. LEXIS 44757, at *20 (N.D. Ohio 2010); *Raizen v. Robbins*, 2006 NY Slip Op 50237U, at *13 (N.Y. Sup. Ct. 2006) ("To establish a cause of action for conversion, a plaintiff must show

(5:10 CV 974)

ownership or superior rights to possession to a specific identifiable thing and must show that the

defendant had exercised an unauthorized dominion over the thing in question to the alteration of

its condition or to the exclusion of plaintiff's superior rights"); *Winchell v. Schiff*, 193 P.3d 946,

950 (Nev. 2008) ("In order to show conversion, [the plaintiff] must prove that [the defendant]

'wrongfully exerted [dominion] over personal property in denial of, or inconsistent with, title or

rights therein or in derogation, exclusion or defiance of such rights.'" *Edwards v. Emperor's*

*Garden Rest.*, 122 Nev. 317, 328 (Nev. 2006)).

Plaintiff's Complaint claims Defendant wrongfully exercised dominion over the "success

fees" "as of the date that *Naphcare entered into each of the respective contracts*." ECF No. 1-1

(emphasis added).  In this case, Plaintiff's conversion claim is predicated purely on Defendant's

refusal to pay the "success fees" under The Consulting Agreements.  *Williamson*, 2011 U.S. Dist.

LEXIS 59584 at *53.  Plaintiff has not advanced evidence of the record from which a reasonable

jury could find a conversion claim independent of Plainitff's breach of contract claim.

Accordingly, the Court GRANTS summary judgment for Defendant on Plaintiff's conversion

claim.

(5:10 CV 974)

## IV.  CONCLUSION

For the foregoing reasons, the Court:

DENIES summary judgment on Count I (breach of contract):

DENIES summary judgment on Count III (unjust enrichment);

GRANTS summary judgment on Count IV (fraud);

GRANTS summary judgment on Count V (conversion); and

DENIES summary judgment on Count VI (declaratory judgment).

This case is presently scheduled for trial on a standby basis for the two-week period

beginning October 17, 2011.  Because of the complexity and variety of the choice of law issues

with respect to the various contracts at issue, it is appropriate to accelerate preparation of jury

instructions and interrogatories.

Accordingly, the parties should file their proposed jury instructions and interrogatories

by September 2, 2011.  The Court will conduct a final pretrial status conference on

September 19, 2011 at 9:00 a.m.

IT IS SO ORDERED.

_August 4, 2011_____                                    _s/ David D. Dowd, Jr._____
Date                                                                               David D. Dowd, Jr.
                                                                                     U.S. District Judge

-33-